# Supreme Court of Florida

_____

No. SC16-2127

_____

**IN RE:  CERTIFICATION OF NEED
FOR ADDITIONAL JUDGES.**

[December 15, 2016]

PER CURIAM.

This opinion fulfills our constitutional obligation to determine the State's

need for additional judges in fiscal year 2017/2018 and to certify our "findings and

recommendations concerning such need" to the Legislature.[1]  Certification is "the

sole mechanism established by our constitution for a systematic and uniform

---

1. Article V, section 9, of the Florida Constitution provides in pertinent part:

> **Determination of number of judges.**—The supreme court
> shall establish by rule uniform criteria for the determination of the
> need for additional judges except supreme court justices, the necessity
> for decreasing the number of judges and for increasing, decreasing or
> redefining appellate districts and judicial circuits.  If the supreme
> court finds that a need exists for increasing or decreasing the number
> of judges or increasing, decreasing or redefining appellate districts
> and judicial circuits, it shall, prior to the next regular session of the
> legislature, certify to the legislature its findings and recommendations
> concerning such need.

assessment of this need." In re Certification of Need for Additional Judges, 889 So. 2d 734, 735 (Fla. 2004). In this opinion, we are certifying a need for twelve additional trial court judges and none in the district courts of appeal as discussed below. We are also decertifying the need for six county court judgeships.

**TRIAL COURT JUDICIAL WORKLOAD STUDY**

This year, we adjusted the trial court case weights due to the completion of a comprehensive workload study in the trial courts. This study validates trial court judges' observations expressed for the last several years; namely, that although filings may be in decline, workload has increased due to case complexity and other judicial obligations contained in statute or rule. A critical component of this effort was the time study that documented the work of over 900 trial court judges in all 20 judicial circuits. The time study documents the actual amount of time judges are spending on different cases and serves as the "what is" piece of judicial workload. We especially agree with Recommendation One of the Judicial Workload Assessment Final Report (Final Workload Report), which notes that "the Florida Legislature should consider creating new judgeships in the circuit courts and county courts where the weighted caseload model shows a need for additional judicial resources."[2] We also accept Recommendations Two and Three of the Final Workload Report, which advocate for updating the case weights every five

2. Id. at 34.

- 2 -

years and conducting a secondary analysis of the impact of the factors enumerated in rule 2.240(b)(1)(B).[3] We are considering Recommendations Four, Five, and Six, which address data related to problem-solving courts, conducting a workload assessment of staff attorneys,[4] and evaluating the contribution and distribution of quasi-judicial resource officers,[5] and have directed our staff to develop an implementation plan for how this might be accomplished, the cost, and a timeline for our consideration. Resources permitting, implementation of these last three recommendations will take time to fully achieve. Nonetheless, these supplemental resources are absolutely essential to the management of cases in the trial courts and the overall administration of justice in Florida.

It has been nine years since the case weights were last updated in 2007, with major intervening events such as the mortgage foreclosure crisis occurring in the interim. Further, while filings are generally in decline for most case types, we have received regular feedback from trial court judges throughout the state that cases have become more complex and take longer to dispose due to a variety of factors. Thus, it became imperative that we conduct a trial court workload study to ensure that the case weights are an accurate reflection of judicial workload.

3. Id. at 34.

4. We have amended Recommendation Five to include an assessment of case managers in addition to staff attorneys.

5. Id. at 35.

Accordingly, in the fall of 2014, this Court directed the Office of the State Courts Administrator (OSCA) and the Commission on Trial Court Performance and Accountability's Court Statistics and Workload Committee (Statistics and Workload Committee) to conduct a Judicial Workload Study designed to review and update the trial court case weights used in the judicial certification process. This study builds upon our two previous efforts to evaluate trial court judicial workload, the 1999 Delphi Workload Study[6] and the 2006-07 Judicial Resource Study.[7] The first study established case weights for the trial courts; the second study resulted in updated case weights for use in the trial court judicial certification process.

In furtherance of this effort, the OSCA contracted with the National Center for State Courts (NCSC), which is nationally and internationally recognized for its expertise, to assist in evaluating judicial workload. The NCSC has conducted

---

6. See Florida Delphi-based Weighted Caseload Project Final Report published in January 2000, available at http://www.flcourts.org/core/fileparse.php/260/urlt/DelphiFullReport.pdf.

7. See Judicial Resource Study conducted in Fiscal Year 2006/2007, available at http://www.flcourts.org/core/fileparse.php/260/urlt/JRSReport_final.pdf.

judicial workload assessments in 31 states to date,[8] including the two previous Florida efforts cited above.

The study also included senior judges and quasi-judicial officers such as magistrates, child support enforcement hearing officers, and civil traffic infraction hearing officers. Quasi-judicial officers are essential to case processing as they assist judges with case dispositions. The workload study captures the actual amount of time quasi-judicial officers are contributing to trial court workload and in which case types. This type of workload information should prove very useful to the state courts system and Legislature as we continue to develop workload staffing models for those individuals who provide direct support to trial court judges.

## JUDICIAL WORKLOAD STUDY METHODOLOGY

In order to properly evaluate trial court workload in Florida, a multi-phase methodology was developed. By design, the methodology was both quantitative and qualitative in nature and structured to allow for maximum trial court participation. The workload study was directed by an executive committee of 41 judges representing every judicial circuit. A one-month time study (quantitative component) involving all county court and circuit court judges along with all

8. See Workload Assessment, National Center for State Courts, available at http://www.ncsc.org/Topics/Court-Management/Workload-and-Resource-Assessment/~/link.aspx?_id=EDC38EAB25094528B6178E6B7FE72D81&_z=z.

quasi-judicial officers occurred in October 2015. Site visits to eight judicial circuits, the distribution of a sufficiency of time survey to all trial court judges, and qualitative adjustment sessions comprise the qualitative aspect of the workload study. A full discussion of the workload study methodology follows.

In October 2014, the OSCA contracted with the NCSC to conduct a workload study of Florida's trial courts. Shortly thereafter, the 41-member judge committee, consisting of one circuit court judge and one county court judge from each circuit nominated by their respective chief judges, provided executive direction to the study. The committee, known as the Judicial Needs Assessment Committee (JNAC), was chaired by The Honorable Paul Alessandroni, County Court Judge, Charlotte County, who also serves as chair of the Court Statistics and Workload Committee. The JNAC reviewed and approved all of the methodological steps of the workload study including: determination of a standard judge day, determination of a standard judge year, identification of case and non-case related activities, delineation of case type categories, administration of time study process and results, implementation of qualitative adjustment process and results, assignment of final case weights, along with the establishment of a qualifying threshold methodology, and completion of a secondary workload factor analysis. In addition, the JNAC approved the workload assessment of senior judges and quasi-judicial officers such as magistrates, child support enforcement

hearing officers, and civil traffic infraction hearing officers. The OSCA served as staff to the JNAC.

The JNAC provided regular communication about the intent, scope, and progress of the workload study to the chief judges and all trial court judges via e-mail, in-person presentations at quarterly judicial leadership meetings, and presentations by the JNAC chair and NCSC staff at the 2015 annual circuit court judges' and county court judges' education programs. To keep the legislative branch apprised of the JNAC's work, the Office of Program Policy and Government Accountability (OPPAGA) was noticed on all meetings and provided copies of all meeting materials. Representatives from OPPAGA attended all JNAC and qualitative adjustment meetings.

**TIME STUDY AND QUALITY ADJUSTMENT PROCESS**

The workload assessment was conducted in two phases: a time study and a quality adjustment process. A one-month time study[9] was conducted in which all circuit court judges, county court judges, senior judges, magistrates, child support enforcement hearing officers, and civil traffic infraction hearing officers were asked to participate. Judges and quasi-judicial officers were asked to record their time in five-minute increments for all case and non-case related activity. Statewide, 582 circuit court judges and 309 county court judges participated in the

---

9. The time study occurred from September 28 through October 25, 2015.

time study, for a participation rate of 97 percent. In addition, 83 senior judges, 118 magistrates, and 150 hearing officers tracked their time, for a participation rate of 96 percent. The inclusion of senior judges and quasi-judicial officers in the time study makes this the most comprehensive judicial workload study ever conducted in Florida.

As noted in the Final Workload Report, the time study is empirically based in that it captures the actual amount of time judges spend on case and non-case related activity each day, "including night and weekend work associated with signing warrants and acting as a 'duty' judge, hearing preliminary matters in criminal, juvenile delinquency, juvenile dependency, and Orders for Protection Against Violence cases."[10] All judges were asked to record the time spent hearing cases at each court level such as county court judges hearing cases in circuit court. Using a web-based tool developed by the NCSC, all participants uploaded their time each day using the case and non-case related categories approved by the JNAC. To enhance their experience and maximize data quality, participants were encouraged to view an interactive training module. Project staff from the NCSC were also available to provide technical assistance via the telephone or e-mail for the entirety of the time study. A preliminary set of case weights was identified as a

10. See Florida Judicial Workload Assessment Final Report at 8, May 16, 2016, available at http://www.floridasupremecourt.org/pub_info/documents/2016-NCSC-Florida-Workload-Study.pdf.

result of the time study. Those preliminary weights were then used by subject matter experts during the qualitative adjustment process.[11]

This second key step in the workload assessment, the qualitative adjustment process, was designed to ensure that the final case weights allow sufficient time for efficient and effective case processing. The qualitative adjustment process included: (1) a statewide sufficiency of time survey that asked judges about the amount of time currently available to perform various case-related and non-case-related tasks; (2) site visits to eight judicial circuits by the JNAC chair, NCSC and OSCA staff; and (3) a structured quality review of the case weights by a set of subject matter expert groups comprised of experienced judges from across the state of Florida. The qualitative adjustment documents "what should be," and is a very important step in the workload study. Over the last several years, this Court has repeatedly heard from chief judges, as well as circuit court judges and county court judges from across the state, that although filings are generally down in nearly all case types, their workload has grown due to a variety of factors. Among those factors cited are increases in case complexity, the need to document considerably more findings of fact, as well as expanding and more extensive statutory and rule requirements.

---

11. See Delphi Method, RAND Corporation, available at http://www.rand.org/topics/delphi-method.html.

The sufficiency of time survey was designed to receive judicial feedback on concerns related to current practice. Specifically, within certain case types, judges were asked to identify particular tasks, if any, where additional time would improve the quality of justice.[12] The survey solicited feedback on case and non-case related work and provided judges with the opportunity to freely comment on their workload, including time required on canvassing boards.[13] Fifty-one percent of circuit court judges and 47 percent of county court judges completed the survey.[14] As cited in the final workload study report, a number of areas were identified by the judges as benefiting from additional time. In circuit criminal cases, pretrial motions and trials were frequently mentioned as areas where more time would improve the quality of justice. "In civil cases, circuit court judges consistently selected dispositive pretrial motions, including conducting hearings and preparing findings and orders, and pretrial and scheduling conferences."[15] "In family law cases, circuit court judges indicated that cases would benefit from additional time to conduct trials and final hearings and to prepare findings and

12. See Florida Judicial Workload Assessment Final Report at 13, available at http://www.floridasupremecourt.org/pub_info/documents/2016-NCSC-Florida-Workload-Study.pdf.

13. Id.

14. Id.

15. Id.

- 10 -

orders related to trials and motions for modification."[16] "Circuit court judges also expressed a need to devote more time to legal research. County court judges cited the impact of cases involving self-represented litigants, pretrial motions in criminal cases, criminal trials, and preparing findings and orders in civil cases."[17]

Another element of the qualitative adjustment process included site visits to multiple circuits. In December 2015, the JNAC chair and staff from the NCSC and OSCA visited eight judicial circuits[18] to receive in-person judicial feedback on factors that judges encounter in processing their cases. The circuits visited represent small, medium, large, and extra-large courts. Some of the circuits visited comprise a single county (e.g., Seventeenth Judicial Circuit), whereas others are multi-county (e.g., Fourteenth Judicial Circuit). During the site visits, structured interviews were conducted with the chief judge, trial court administrator, and judges from every division and level of court. The interview process allowed staff to document judicial concerns about case processing practices and procedures, as well as receive feedback on resource constraints that may be affecting judicial effectiveness. Several key themes emerged from the site visits, including the

16. Id.

17. Id.

18. Judicial circuits visited: First (Pensacola), Fourth (Jacksonville), Fifth (Ocala), Eighth (Gainesville), Tenth (Lakeland), Fourteenth (Panama City), Fifteenth (West Palm Beach), and Seventeenth (Ft. Lauderdale).

critical nature of staff attorneys for legal research and case managers for case processing, along with a general and repeated assessment that many cases are becoming more complex.

As noted above, judges view staff attorneys as an essential supplemental resource to effective case processing. One judge quoted in the final report notes that "staff attorneys are critical for motion practice issues, both criminal and civil." Also noted in the final workload report, "staff attorneys perform many research, writing, and case management tasks which enhance both the efficiency and quality of judicial decision-making."[19] Other essential tasks performed by staff attorneys documented in the final workload report include work on "motions for post-conviction relief, drafting orders, researching legal issues related to motions, assisting with dismissals for lack of prosecution, monitoring filings in probate and guardianship cases, and acting as 'gatekeepers' to prevent ex parte communications."[20] Judges in several jurisdictions reported long delays in accessing the services of staff attorneys for research assignments. These delays have caused judges to limit their own research requests. Also mentioned in the Final Workload Report, "county court judges have limited access to staff attorneys

_____

19. See Workload Final Report at 14, available at http://www.floridasupremecourt.org/pub_info/documents/2016-NCSC-Florida-Workload-Study.pdf.

20. Id.

- 12 -

but believe they would benefit from research on more complex cases such as insurance cases."[21]

Case managers were also cited by the judges as being an invaluable resource. The site visits affirm the consistent judicial feedback this Court has received about the value of case managers, both from experienced family law judges and those judges presiding over real property cases during the mortgage foreclosure crisis. As noted in the Final Workload Report, "judges rely on case managers to monitor cases for activity and identify cases that are not advancing so that appropriate action can be taken."[22] Absent case managers, judges or their staff attorneys must perform these functions themselves, or, alternatively, if they are too busy with the actual adjudication component, cases may take longer to dispose. Nearly all circuit court judges and county court judges interviewed reported a need for additional case managers. Their observations are consistent with the narrative in our Legislative Budget Requests over the last several years where we have documented in our requests this need for funding for additional case managers.

Another critical finding of the site visits is that cases are becoming increasingly complex. Both circuit court judges and county court judges noted that case complexity is a challenge. In county court, insurance cases are being

21. Id.

22. Id.

- 13 -

aggressively litigated. Often these cases require legal research and compare to circuit court cases in their complexity.[23] As cited in the Final Workload Report, "in family and juvenile cases filed in circuit court, the number of issues requiring specific findings of fact has increased, the extra judicial time spent addressing these issues in orders can increase stability for families by reducing the number of cases overturned on appeal."[24] "In circuit civil cases, judges observed that the volume of discovery requested has increased and cases with larger amounts in controversy often involve more hearings."[25] Also cited in the Final Workload Report, "in circuit criminal cases, judges report that tougher mandatory minimum sentences have increased the amount of motion practice as well as trial rates."[26]

In addition to the sufficiency of time survey and site visits, NCSC staff also facilitated a series of Delphi[27] qualitative adjustment group sessions with circuit court judges and county court judges in February 2016. Six Delphi groups of between eight and thirteen judges representing different circuit sizes met to review and adjust the preliminary case weights. A total of 65 experienced judges (three or

---

23. Id.

24. Id. at 15.

25. Id.

26. Id.

27. The Delphi method is a structured iterative process for decision-making by a panel of experts; in this instance, judges.

more years of judicial experience) participated.  The groups focused on a particular division of court including circuit civil, circuit criminal, family and juvenile, probate, county criminal, and county civil.[28]  An overview of the process used to create the preliminary weights and a review of the sufficiency of time survey results were provided by NCSC staff.[29]  Each group participated in a systematic review of the preliminary case weights using a modified Delphi process.[30]

This consensus-based review of the case weights was "designed to ensure that all recommended adjustments were reasonable and would produce specific benefits such as improvements in public safety, cost savings, increases in procedural justice, and improved compliance with court orders."[31]

Several of the family and civil Delphi sessions recommended increasing the time devoted to pretrial case management, the rationale being that time spent at the beginning of a case will result in earlier disposition times in some cases and narrow the issues for trial in others.  As mentioned in the Final Workload Report, "the family and juvenile groups recommended allocating additional time to assess the needs of children and families to identify services and resources, allow

---

28. Id.

29. Id.

30. Id.

31. Id. at 15.

sufficient time for self-represented litigants to understand the legal process, and to write more detailed findings and orders that thoroughly address all statutory requirements."[32] In criminal cases, the Delphi groups "recommended adding time for legal research, longer plea colloquies, and contested hearings."[33]

The county court Delphi groups recommended additional time for legal research and writing in criminal cases, complex insurance cases, criminal traffic cases involving serious bodily injury or fatalities, and in post-judgment motions related to eviction cases.[34] Appendix C of the Final Workload Report provides a full description and detailed rationales for all recommended adjustments.

The JNAC met on March 3, 2016, to review the entire workload methodology, including the major findings and recommendations. Three factors contribute to the calculation of judicial need in the weighted caseload model: filings, case weights, and judge year value.[35] The JNAC adopted the judge year value of 215 days, which is the number of days each year that judges are available to work, excluding weekends, holidays, vacation, and sick leave.[36] According to

32. Id. at 15-16.

33. Id. at 16.

34. Id.

35. Id. at 18.

36. Id.

the NCSC, the judge year in 25 other states ranges from 200 to 226 days. Florida's judge year of 215 days is the median of the 25 states that have conducted judicial workload assessments. The JNAC also adopted the judge day value, which represents the amount of time each judge has available for case-related work during each workday.[37] The total workday for circuit court judges is eight and one-half hours and includes six hours of case-related work, one and one-half hours of non-case related work including administration and travel, and one hour for lunch. The total workday for county court judges is eight and one-half hours and includes five hours for case related work on county court cases, one hour for case related work on circuit court cases, one and one-half hours on non-case related work, and one hour for lunch.[38]

The JNAC adopted new recommendations proposed by the NCSC not previously used by the Court in its evaluation of trial court workload, including a chief judge adjustment for time spent by chief judges performing administrative matters[39] and time spent by county court judges serving on county election

---

37. Id. at 19.

38. Id.

39. Id. at 20.

canvassing boards.[40] The JNAC also accepted all quality adjustments to the preliminary case weights. As noted in the final workload report, "in the aggregate, the Delphi adjustments result in a combined increase in circuit and county court judicial workload of about two percent."[41] Exhibit 6 located on page 17 of the Final Workload Report illustrates the final cases weights adopted by the JNAC.

The NCSC recommended, and the JNAC adopted, a new threshold methodology for when a circuit or county would qualify for a new judgeship. As discussed in the Final Workload Report, "to provide a common yardstick for jurisdictions of all sizes and to assist in directing additional judicial resources to the jurisdictions with the greatest relative need, a majority of the JNAC voted to adopt the following rules:

1. In any court where the ratio of judicial need to existing positions is greater than 1.10, additional judicial positions should be allocated to bring the ratio below 1.10.

2. In any court where the ratio of judicial need to existing positions is between 1.10 and 0.90, no change to the number of judicial positions is recommended.

---

40. Id.

41. Id. at 16.

3.  In any court where the ratio of judicial need to existing positions is below 0.90, judicial positions should be subtracted until the ratio is above 0.90, unless subtracting positions brings the ratio above 1.10."[42]

As noted in the Final Workload Report, "in the First Judicial Circuit, 24 judges are currently handling the work of 27.95 judges or 1.16 full time equivalent (FTE) per judge. Adding a single judge would bring the ratio to 1.12 FTE, still in excess of 1.10. Adding two judges would reduce the ratio to 1.08, below the 1.10 threshold."[43] This recommendation is significantly more rigorous and conservative than our previous 0.50 threshold. In fact, this new threshold requires that all judges within a county or circuit court collectively absorb 10 percent additional workload before qualifying for a new judgeship. In practical terms, this means that judges must share excess workload, leaving each judge with a total of 1.10 full-time equivalent of judicial work prior to being considered for a new judgeship.

In addition to the new workload threshold, the JNAC adopted a secondary analysis recommendation designed to identify other workload factors present in a county or circuit that may affect judicial workload. Several additional factors such as jury trials, foreign language interpretations, and geographic size of a circuit are currently listed in Florida Rule of Judicial Administration 2.240(b)(1)(B). In

---

42. Id. at 26.

43. Id.

addition to those currently cited in the rule, the JNAC recommended consideration of other factors such as the existence of alternative problem-solving courts, prosecutor and law enforcement practices, "the location of correctional facilities, hospitals, universities, the quality and scope of court technology, ensuring access to justice, and variations in the amount of judicial work associated with election canvassing boards."[44]

The Judicial Workload Study was significant not only for documenting the work of trial court judges, but also for capturing the contributions of senior judges, as well as quasi-judicial officers such as magistrates, child support enforcement hearing officers, and civil traffic infraction hearing officers. Each of these groups participated in the time study, with an overall participation rate of 96 percent. The work of these quasi-judicial officers is critical to the overall management of court workload. This study and its data provide significant insight as to the use of quasi-judicial officers and their contribution to judicial workload. It will prove invaluable in future years as we attempt to establish workload staffing models across circuits.

As described in the Final Workload Report, "[s]enior judges are retired judges who have agreed to accept assignments to temporary judicial duty to fill-in

---

44. Id. at 27.

for long-term judicial absences (e.g., illness or death) and to assistance with excess workload (e.g., Foreclosure cases)."[45]

"Magistrates are judicial officers appointed by the court to assist the work of Circuit court judges. Magistrates hold formal court hearings providing recommendations to judges in the areas of family law, support enforcement, juvenile dependency, mental health, and guardianship."[46]

"Child Support Enforcement Hearing Officers are attorneys who have been appointed by administrative order of the court. The hearing officers are typically used in family court to take testimony and recommend decisions in cases involving the establishment, enforcement, and/or modification of child support as well as paternity matters."[47]

"Civil Traffic Infraction Hearing Officers are contractual employees (also attorneys) that serve on a part-time basis to provide back-up to judges by hearing and making decisions in non-criminal traffic matters. These hearing officers typically serve in county court, and the decisions they make can be appealed to a regular sitting judge."[48]

---

45. Id. at 28.

46. Id. at 27.

47. Id. at 28.

48. Id.

- 21 -

As documented in the Final Workload Report, the time study revealed that "senior judges perform more than 460,000 minutes of work on Real Property cases each year, suggesting that some jurisdictions use senior judges to preside over specialty foreclosure dockets."[49] "Magistrates perform some of the family law work accompanying dissolution, paternity, other domestic relations, juvenile dependency cases, as well as commitment and guardianship cases. Hearing officers handle 72 percent of the total judicial work associated with civil traffic infractions and 78 percent of work on child support cases."[50] Exhibit 14c of the Final Workload Report converts the workload of quasi-judicial officers into case weights and provides a more complete picture of the overall judicial resources devoted to each type of case.[51] Without the availability of these supplemental judicial resources, it is anticipated that case processing times would be significantly longer.

## JUDICIAL WORKLOAD STUDY RECOMMENDATIONS

The Court reviewed the Judicial Workload Study recommendations and has adopted Recommendations One, Two, and Three, which address the new case weights, a periodic review of the case weights, and consideration of secondary

49. Id.

50. Id.

51. Id. at 31.

factors that may be impacting judicial workload.[52]  The workload study used calendar year data for 2012, 2013, and 2014.  However, during this analysis we used projected case filings through fiscal year 2017/2018 in accordance with rule 2.240(b)(1)(A)(i) and rule 2.240(b)(1)(A)(ii).  Using the objective threshold standard and judgeship requests submitted from the lower courts, we have examined case filing and disposition data, conducted a secondary analysis of judicial workload indicators, and used the final adjusted case weights from the workload study.  We have also incorporated an allowance for administrative time spent by chief judges, county court judge time spent on county election canvassing boards, and the new, more rigorous, threshold for qualifying for a new judgeship.  Applying this methodology, this Court certifies the need for twelve judgeships statewide, four in circuit court and eight in county court.  See Appendix.  We are also decertifying six county court judgeships.  See Appendix.

**CIRCUIT COURT WORKLOAD**

A key finding of the Judicial Workload Study is validation of the long-held belief of many trial court judges that their workload has increased over the last several years.  The time study and quality review process associated with the case weight development documents that cases are taking longer to dispose due to a variety of factors as previously mentioned.  This finding is essential and illustrates

---

52. Id. at 34.

the necessity for a regular review of the judicial case weights (i.e., every five years) via a time study. Moreover, the rigorous threshold recommended by the JNAC and adopted by this Court reflects the fact that, notwithstanding that cases are more complex and take longer to dispose, filings across all court divisions remain in decline. Thus, the 41 trial court judges who provided executive direction to the Judicial Workload Study recommended, and we agree, that all judges within a circuit are obligated to help each other with their respective workloads, thereby ensuring that the full measure of judicial capacity is applied to all judicial workload. This new threshold emphasizes the collective nature of addressing judicial workload by requiring judges to work together to fully leverage all available judicial resources. We adopt this recommendation and encourage all trial court judges to embrace its inherent intent as it is prudent, reasonable, and fair.

In their judicial needs applications, the chief judges identified a number of factors that continue to impact judicial workload in the circuit courts. For example, the continued expansion and proliferation of problem solving courts (e.g., Adult Drug Court, Veterans' Courts, Mental Health Courts) contribute significantly to judicial workload as they are labor intensive, requiring multiple hearings for each defendant, typically over a lengthy period of time. Indeed, Recommendation Four of the Final Workload Report indicates that we adopt a data reporting mechanism for problem-solving courts to better assess the workload

associated with these types of cases. The Court agrees with this recommendation and is committed to developing a system that documents this workload in Florida.

The chief judges have also noted that the number and frequency of court-interpreting events impact case disposition times. Florida is an ethnically and culturally diverse state with thousands of non-English speaking residents who access our courts each year, and this demand is expected to increase in coming years. This Court is mindful of the demographic changes occurring in Florida and has implemented rigorous steps to ensure that the quality of court-interpreting services remains high by requiring credentialed interpreters to provide interpreting services[53] and also by implementing video remote interpreting services across circuits using credentialed employees and contractors. Moreover, we are very encouraged by the preliminary results of our Virtual Remote Interpreting pilot program and have identified several key advantages to its possible expansion, including: (1) containing the need for additional full-time equivalent positions and contractual dollars; (2) providing for the use of credentialed interpreters to conduct interpretations; (3) providing greater scheduling flexibility for our judges; and (4) leveraging court-interpreting resources across judicial circuits.

The application of this technology demonstrates the court system's commitment to contain costs, innovate, and improve service delivery within this

---

53. See In re Amends. to Fla. Rules for Certification & Regulation of Spoken Language Court Interpreters, 176 So. 3d 256, 257 (Fla. 2015).

due process element.  Similar efforts are occurring using software applications such as Open Court and the Integrated Case Management System developed by the Eighth Judicial Circuit.  Both of these software platforms are open source and have tremendous potential for cost containment and the avoidance of vendor lock-in issues associated with the purchase of specialized technology.  We encourage the Legislature to favorably consider our Legislative Budget Request for technology as it demonstrates the judicial branch's commitment to apply technology in our service delivery staffing models, thereby minimizing our requests for additional full-time equivalent positions.

The chief judges have also advised us of a notable need for more staff attorneys, primarily in circuit court and to a lesser extent in county court.  This observation was verified during the site visits to eight judicial circuits during the workload study.  There is significant workload associated with postconviction relief motions in circuit criminal divisions.  Similarly, complex legal issues need to be researched in circuit civil divisions.  Much of this preliminary research is more efficiently performed by staff attorneys who provide direct legal support to judges.

The same rationale holds true for our case management positions.  Circuit court judges repeatedly advised both NCSC members and our staff during the workload study site visits how invaluable case managers are to keeping dockets current.  Many of these positions are assigned to provide support in family law,

problem solving courts, and mortgage foreclosure cases, and are essential to ensuring that all documents and related paperwork are filed and complete so judges can move cases to disposition. The absence of these critical support positions often leads to case processing delays.

On a related matter, chief judges have advised us that because in-court administrative staff has either been reduced or eliminated due to budget reductions, many trial court judges are now performing in-court administrative duties such as managing the court record, handling exhibits, swearing witnesses, filing documents, and making notations in the case management systems. Judges performing ministerial and administrative functions is not a good use of judicial time and supports our contention that circuit court judges need additional administrative/case management assistance that is best supplied by case managers.

Several of the chief judges also advised that they are experiencing difficulty in securing senior judges to serve within their circuits. While the Court believes that our senior judge day allotment may be sufficient, we remain concerned that the one-year sit-out provision for retiring judges is impacting the court system's ability to secure senior judges in different regions throughout the state. We encourage the Legislature to revisit the one-year sit-out requirement as it is detrimental to Florida's court system and the administration of justice.

In consideration of the chief judges' requests and by applying the new case weights and secondary factors to circuit court workload, we certify the need for one circuit court judgeship in the Fifth Judicial Circuit and three circuit court judgeships in the Ninth Judicial Circuit.

## COUNTY COURT WORKLOAD

One of the key findings of the Final Workload Study is the documentation of circuit court work performed by county court judges. It is significant and widespread throughout the state and is testimony to county court judges making prominent contributions to assisting with the overall workload within a circuit. In fact, their contribution in circuit court is now codified into the standard judge day for county court judges, which allocates one hour each day for presiding over circuit court matters.

Another key finding of the Final Workload Study is the time spent by county court judges on election canvassing boards. This work can be considerable, especially during gubernatorial and presidential election years. This is a much needed improvement to our workload methodology.

During the site visits, two key themes emerged in staff discussion with the county court judges. First, personal injury protection insurance cases, commonly referred to as PIP cases, are taking an ever-increasing amount of judicial time. Frequently, they are heavily litigated and often result in a jury trial, which requires

considerable judicial time. Indeed, some of the county court judges recommend that we modify our existing case types by creating a separate case type and weight for these types of cases for future workload assessments. We take that recommendation under advisement. Second, many of the county court judges interviewed indicated an increasing need for access to staff attorney assistance as civil cases in county court are becoming more complex, requiring considerable legal research and analysis.

The Final Workload Study revealed a positive need for eight county court judges disbursed over six counties with a demonstrable need. However, the study also revealed a negative net need of 14 county court judges disbursed over nine counties, meaning there is insufficient workload for the current number of judges in those counties. Our own analysis, using projected filings data, supports the original findings of the workload study; namely, that there is a positive need for additional county court judges in some counties and a surplus of county court judges in other counties. However, to better assess whether we should decertify any of these county court judgeships, we conducted an analysis of secondary factors identified by the chief judge of each affected county, via the judicial needs application, that might militate against decertification, such as geography, number of branch courthouses, access to justice concerns, and others factors listed in the

Florida Rules of Judicial Administration.[54] Accordingly, we are certifying the need for one additional county court judgeship each in Citrus County, Flagler County, Palm Beach County, Broward County, and Lee County, and three additional county court judgeships in Hillsborough County.

We are also decertifying county court judgeships in the following counties: one county court judgeship in Pasco County, one county court judgeship in Putnam County, one county court judgeship in Monroe County, one county court judgeship in Brevard County, one county court judgeship in Charlotte County, and one county court judgeship in Collier County. Over the next twelve months, we will be closely monitoring the judicial workload of several other counties[55] that demonstrate a negative need, but also identified supplemental factors recognized both in rule and by the NCSC's recommended methodology which militate against decertification, to determine whether additional decertifications should occur in next year's certification of need opinion. The Court does not take this step lightly; rather, we do so recognizing that we must remain consistent in our application of the workload methodology and our obligations under Article V, section 9, of the Florida Constitution.

---

54. See Fla. R. Jud. Admin. 2.240(b)(1)(B).

55. Alachua, Brevard, Escambia, Leon, Monroe, Pasco, and Polk counties.

## SELF-REPRESENTED LITIGANTS

This Court remains concerned about the ability to meet the needs of self-represented litigants and the impact a lack of representation has on access to justice and the administration of the court system. Indeed, many of the trial court judges interviewed during the Final Workload Study commented on the impact of self-represented litigants in their courtrooms. Their impact was also cited by the chief judges in their judicial needs applications. Self-represented litigants are frequently unprepared for the rigors of presenting evidence, following rules of procedure, and generally representing themselves in court, often creating additional work for trial judges. Increased judicial involvement in cases where one or more parties self-represent is essential to assure fair and impartial access to courts, but entails lengthier hearings, rescheduled hearings, and court delay. The impact of case processing to ensure self-represented litigants have access to justice occurs in both circuit court and county court and was affirmed by the Final Workload Study. To better evaluate this need and impact separate and apart from the Final Workload Study, this Court appointed a Florida Commission on Access to Civil Justice, which is discussed below.

## FLORIDA COMMISSION ON ACCESS TO CIVIL JUSTICE

The Florida Commission on Access to Civil Justice was created via administrative order on November 14, 2014. The Commission was "established to

study the remaining unmet civil legal needs of disadvantaged, low income, and moderate income Floridians. The Commission is charged with considering Florida's legal assistance delivery system as a whole, including but not limited to staffed legal aid programs, resources and support for self-represented litigants, limited scope representation, pro bono services, innovative technology solutions, and other models and potential innovations."[56]

Over the last two years, the Commission and its committees have met regularly. To address the Commission's charges, the Chief Justice initially created five subcommittees: Outreach, Access to and Delivery of Legal Services, Continuum of Services, Technology, and Funding. Three projects emanating from these committees, which have generated considerable optimism, are the implementation of a gateway portal, the expanded use of emeritus attorneys, and the adoption of a cy pres[57] rule or statute.[58] A fourth project under development

---

56. See In re: Fla. Comm'n on Access to Civil Justice, Fla. Admin. Order No. AOSC14-65 (Fla. Nov. 24, 2014).

57. The cy pres doctrine permits a court to award any unallocated, unclaimed, or undeliverable funds from a class action settlement or judgment to a non-profit organization. See "Commission on Access to Civil Justice Submits Final Report," Full Court Press, Summer 2016 Issue, Office of the State Courts Administrator, available at http://www.flcourts.org/core/fileparse.php/295/urlt/001186-Summer2016_FCP.pdf.

58. For a more thorough discussion of these projects, see id.

and initiated by the Judicial Management Council, called Do-It-Yourself Florida, provides for automated interviews designed to assist self-represented litigants with creating their own petitions which, once complete, can then be submitted through the Florida Courts E-Filing Portal.  The original term of the Commission was extended until September 30, 2016.[59]  The final report for the Commission's initial term is available through this Court's website.[60]

On October 10, 2016, the Court issued an administrative order[61] re-establishing the Florida Commission on Access to Civil Justice as a standing commission.  In our press release, we note that the permanent Commission will "study the remaining unmet civil legal needs of disadvantaged, low income and moderate income Floridians."  The administrative order directs the Commission to examine the issue from all perspectives and not be limited to the viewpoint of any one institution.  The Commission is to consider staffed legal aid programs, resources designed to help people representing themselves, legal advice specifically limited to a single issue in a case, pro bono services, technology

---

59. See In re: Fla. Comm'n on Access to Civil Justice, Fla. Admin. Order No. AOSC16-27 (Fla. June 13, 2016).

60. See Florida Commission on Access to Civil Justice Final Report (June 30, 2016), available at http://www.flaccesstojustice.org/wp-content/uploads/2016/06/ATJ-Final-Report-Court-06302016-ADA.pdf.

61. See In re: Fla. Comm'n on Access to Civil Justice, Fla. Admin. Order No. AOSC16-71 (Fla. Oct. 10, 2016).

solutions, and other models and potential innovations.  It is our long-term aspiration that improvements to court access will have a positive impact on our future need for additional judicial resources.

## DISTRICT COURTS OF APPEAL

In September 2014, the Commission on District Court of Appeal Performance and Accountability (DCA Commission) began the process of reviewing relative case weights for district court judges, as directed in In re Commission on District Court of Appeal Performance and Accountability, Fla. Admin. Order No. SC14-41 (Fla. July 2, 2014).  The Supreme Court charged the DCA Commission with reviewing "workload trends of the district courts, specifically relative case weights for judicial workload as required by rule 2.240(b)(2)(B)(ii), Florida Rules of Judicial Administration."  Previous reviews by the DCA Commission occurred initially in 2006, and subsequently in 2009.  The 2009 review resulted in a modifier for the First District Court of Appeal to address workload issues in the category of "Notice of Appeal – Administrative (Other)."[62] After studying the issue, the DCA Commission recommended revising the relative case weights, removing the modifier for the First District Court of Appeal, and reviewing the weighted case disposition threshold of 280 cases per judge.

---

62.  "Notice of Appeal – Administrative (Other)" is defined as any appeal from an administrative agency other than an unemployment appeal from the Reemployment Assistance Appeals Commission.

At the Court's direction, the DCA Commission subsequently reviewed both the weighted case disposition threshold methodology established in 2005 and current data applied to the methodology, and recommended that the threshold be revised to 315 cases per judge. Additionally, the commission recommended that a review process for the threshold be established, following a four-year cycle similar to that of the relative case weights, and that rule 2.240(b)(2)(B) be amended to remove the specific threshold number of 280 and provide for a four-year review cycle. The Court approved the revised relative case weights, removal of the modifier, the revised weighted case disposition threshold, and the four-year review cycle. Rule 2.240(b)(2)(B) was also amended to remove the specific threshold number and provide for the review cycle. We are not certifying a need for additional district court judges during this certification cycle, as our review, applying the updated relative case weights methodology, indicates adequate resources.

Using the updated relative case weights and applying the new case disposition threshold of 315 cases per judge, the Court finds that the Third District Court of Appeal may be overstaffed by one judge. We also observe that, unlike the other four districts, the Third District Court of Appeal does not employ a central staff model to assist with judicial workload. These appear to be legacy issues that require our continued attention. While we recognize the need for flexibility in the

deployment of resources within a district court, we also see the value and merit in having similar workload models (i.e., presence of central staff) across districts as the work of the district courts is more similar than dissimilar. As with the trial court workload methodology and our obligations under Article V, section 9, of the Florida Constitution, we must be vigilant as to the deployment of judicial resources. We have communicated our concerns to the chief judge of the Third District Court of Appeal and have asked for a response. We will keep the Legislature apprised of our analysis in next year's certification of need opinion.

## CONCLUSION

We have conducted both a quantitative and qualitative assessment of trial court judicial workload. Using the new case weights developed in the Judicial Workload Study and the application of other factors identified in Florida Rule of Judicial Administration 2.240, we certify the need for twelve additional trial court judges in Florida, consisting of four in circuit court and eight in county court, as set forth in the appendix to this opinion. We are also recommending the decertification of six county court judgeships, also identified in the appendix.

With the help of staff from the National Center for State Courts, Florida's trial courts have spent the last 18 months evaluating judicial workload. This has been an extensive effort involving the participation of over 900 trial court judges representing all 20 judicial circuits. We have applied a rigorous methodology

designed to evaluate both quantitative and qualitative aspects of judicial work, including: (1) appointment of an executive committee comprised of 41 trial court judges, two from each judicial circuit; (2) participation in a one-month time study with a 97 percent participation rate; (3) execution of a sufficiency of time survey; (4) site visits to eight judicial circuits; (5) a qualitative adjustment process involving 65 experienced judges; and (6) final review and approval of the adjusted case weights along with additional recommendations such as a higher and more conservative threshold for qualifying for a new judgeship.

The workload study has been a massive judicial branch undertaking and demonstrates our commitment to full documentation and transparency in the evaluation of judicial workload. It has now been ten years since Florida last received funding for new trial court judges. We are mindful that the mortgage foreclosure crisis and other intervening events impacted the state's fiscal health. Since those crises are waning, we strongly encourage the Legislature to fund the new judgeships identified in this opinion.

The Court extends its sincere thanks and appreciation to The Honorable Paul Alessandroni, Chair of the Judicial Workload Study; all members of the Judicial Needs Assessment Committee who provided executive direction; all circuit court judges and county court judges for their participation in the time study and qualitative adjustment process; and all senior judges and quasi-judicial officers,

who took part in the time study.  We also thank project staff at the National Center for State Courts for their diligent work and collaboration with our staff in the completion of this critical work.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

Original Proceeding – Certification of Need for Additional Judges

# APPENDIX
## Trial Court Need

| Circuit | Circuit Court Certified Judges | County | County Court Certified Judges | County Court Decertified Judges |
|---|---|---|---|---|
| 1 | 0 | N/A | 0 | 0 |
| 2 | 0 | N/A | 0 | 0 |
| 3 | 0 | N/A | 0 | 0 |
| 4 | 0 | N/A | 0 | 0 |
| 5 | 1 | Citrus | 1 | 0 |
| 6 | 0 | Pasco | 0 | 1 |
| 7 | 0 | Flagler | 1 | 0 |
| 7 | 0 | Putnam | 0 | 1 |
| 8 | 0 | N/A | 0 | 0 |
| 9 | 3 | N/A | 0 | 0 |
| 10 | 0 | N/A | 0 | 0 |
| 11 | 0 | N/A | 0 | 0 |
| 12 | 0 | N/A | 0 | 0 |
| 13 | 0 | Hillsborough | 3 | 0 |
| 14 | 0 | N/A | 0 | 0 |
| 15 | 0 | Palm Beach | 1 | 0 |
| 16 | 0 | Monroe | 0 | 1 |
| 17 | 0 | Broward | 1 | 0 |
| 18 | 0 | Brevard | 0 | 1 |
| 19 | 0 | N/A | 0 | 0 |
| 20 | 0 | Charlotte | 0 | 1 |
| 20 | 0 | Collier | 0 | 1 |
| 20 | 0 | Lee | 1 | 0 |
| **Total** | **4** | **Total** | **8** | **6** |